## COMMISSION OF FINANCE v. INDUSTRIAL COMMISSION et al.

No. 7113.   Decided March 31, 1948.   (191 P. 2d 598.)

See 71 C. J., Workmen's Compensation Acts, sec. 248. Needy persons put to work by municipality or other public body as means of extending aid to them as within protection of Workmen's Compensation Act, see note, 96 A. L. R. 1154.

F. A. *Trottier*, of Salt Lake City, for plaintiff.

*Grover A. Giles*, Atty. Gen., *A. John Brennan*, Deputy Atty. Gen., and *Horace J. Knowleton*, of Salt Lake City, for defendants.

LATIMER, Justice.

On February 3, 1947, applicant, Albert M. Frazier, sustained an accidental injury while working at the State Fair Grounds in Salt Lake City, Utah. At the time of the injury he was working on a scaffold and was assisting in tearing down a partition in one of the buildings. While in the act of prying a board loose, he slipped and fell some seven feet, falling onto a stove and injuring his leg.

Applicant filed an application for compensation and medical expenses with the Industrial Commission, and after a hearing the commission held him to be an employee of the Utah State Fair Association and made an award in his favor. The State Insurance Fund, by writ of certiorari, brings the matter to this court for review. There are only two questions which need be determined in this decision, and the facts bearing on each will be referred to as each question is considered.

The most important question is whether or not Frazier was an employee subject to the Compensation Act of this State. The facts controlling on this phase of the controversy are these: For some considerable time prior to 1946, Frazier had been receiving assistance from the State Welfare Department. An investigation of his circumstances had been made by the County Welfare Division and prior to being assigned to work at the Fair Grounds he had been receiving $40 per month, paid on a monthly basis. Early in 1946 the Governor and State Welfare Commission worked out a plan whereby welfare aid recipients who were able

to perform work would be assigned to certain projects and required to contribute their services in return for the aid received. Pursuant to this plan applicant was told to report for a physical examination and after being found physically employable was directed to report to the State Fair Association for work. His rate of pay or relief payment was fixed at $14.25 per week figured on an hourly basis of 75 cents per hour. That is, he had to work his weekly wage out at the hourly rate, and when he had worked his allotted hours he could continue on with his work, but he would receive no additional sum over and above the allotted amount. The previous method of monthly payment to applicant was changed, and once a week a representative of the State Welfare Board would deliver the weekly checks to the State Fair Association and the checks would in turn be delivered to the applicant. The County Welfare Board determined the applicant's eligibility for work and gave him a slip to present to the State Fair Association showing the hourly rate to be paid and the number of hours applicant was to work.

According to the Secretary-Manager of the Utah State Fair Board, when welfare recipients reported for work they were interrogated in regard to their desire to work, and if they expressed an intent to perform services they were sent by the manager of the State Fair Association to the Superintendent of the Fair Grounds, who supervised and controlled their activities. Further, according to this witness the Superintendent had authority to discharge the workers if their services were not satisfactory, and in some instances this had been done. The procedure was for the superintendent to report unsatisfactory performance to the office of the State Fair Association, and this information would be relayed to the State Welfare Board. Just what arrangements the State Welfare Board made for termination of relief, or assignment to other projects, in the event of discharge from work, does not appear in the record, but the unsatisfactory recipients were told not to return to the State Fair Grounds for further labors. Inferentially it ap-

pears that if they failed to perform satisfactorily, payments from the Welfare Fund would be stopped.

When the State Welfare Board worked out the plan for requiring welfare recipients to work out their payments, it adopted certain rules and regulations governing the mode of operation. Those tending to reflect on the status of welfare workers are as follows:

"41313. Welfare Work Program. Pursuant to resolution adopted by the State Public Welfare Commission on January 24, 1946, all able-bodied employable persons now receiving assistance from the county department of public welfare or who may hereafter be accepted for assistance shall be referred to the Welfare Work Program under the following plan:

"* * * Upon completion of the investigation an employable applicant if eligible, shall be assigned to a work project by the county department of public welfare. In making the assignment Form WWP-1 shall be completed and delivered to the client, by mail or otherwise, who shall present it to the work projects director as evidence of eligibility and assignment. Upon receipt of such certification the project director shall provide tools and equipment, necessary material, *workmen's compensation insurance*, and suitable employment to enable the recipient to work out his monthly grant on a weekly basis.

"The rate of pay shall be 75c per hour for all non-skilled labor. If skilled labor is required and a skilled worker is assigned to a project, he shall be paid the prevailing hourly rate of his trade, the rate to be fixed by the project director.

"The project sponsor shall be required to keep an accurate time record of all persons employed on work projects and shall report to the county welfare department on Saturday of each week the number of hours worked and the rate of pay per hour for each individual working on the project. * * *"

"It shall be the duty of the project director to report immediately to the county welfare department the name and amount of earnings of *any person severed from the project. * * *"

"Any person assigned to the welfare work program shall be allowed to earn as nearly as may be, an amount equal to his weekly budget, but not more in any one week. *If, for any reason, a project worker is unable to work out his weekly budget, he shall be paid only for the number of hours worked.*"

"Any person *employed on a project under the Welfare Work Program may be discharged by the sponsor or the work projects director* if his conduct or work on the project is deemed unsatisfactory." (Italics added.)

While these quoted provisions may not establish an employer-employee relationship, they are helpful in determining the intent of the framers of the plan; the burden they expected sponsors to assume if they were to accept the benefits of the plan; and the construction the State Welfare Department and the State Fair Association placed on the status of those welfare recipients who participated in the work program.

One other item which is considered of importance to this decision is that the work being done by applicant had some substantial economic value to the State Fair Association. This Association accepted the relief workers because the improvements were necessary and valuable, but the appropriation made by the state legislature did not permit the work to be done by regularly employed persons within the amount of money appropriated.

If this were a case of first impression in this jurisdiction it would be appropriate to trace the development of the law on the subject. However, a similar principle was considered in the case of *Weber County-Ogden City Relief Committee* v. *Industrial Commission*, 93 Utah 85, 71 P. 2d 177, and while the facts in the two cases are dissimilar, many of the authorities relied on in that case deal with the principles involved in this suit. In that case, the work being done by the welfare worker was of economic value to the city, and we held the worker to be within the definition of an employee as used in the Compensation Act. The decision in that case was handed down in 1937, and subsequent legislative bodies have not amended the law to exclude relief workers. We, therefore, assume the elegislative department of the state was satisfied that within the limits of that decision, a relief worker was entitled to the benefits of the Workmen's Compensation Act.

Counsel for the State Insurance Fund seeks to differentiate this case from the *Weber County* case, supra, because here it is contended the state is required to furnish relief to needy citizens, and as part of this program the state can require services in return, without assuming the liabilities

of an employer. That by requiring the welfare recipient to perform services the state does not thereby become an employer. The following quotation from that case, at page 98 of 93 Utah, at page 183 of 71 P. 2d, is cited as authority for this proposition:

"An examination of the cases holding that a relief worker is not an employee within the meaning of the Workmen's Compensation Act will disclose that the courts in many of the cases arrived at this conclusion because the public body sought to be charged as an employer was under statutory obligation to provide for its indigents and by reason thereof would be, entitled to the services rendered by such indigents; that because of the duty of the municipality to give support to the needy the relationship between it and the relief worker could not be considered wholly voluntary. *Clark* v. *North Dakota Workmen's Comp. Bureau*, 66 N. D. 17, 262 N. W. 249. Other cases, while not discussing or referring to any statutory duty resting on the public body involved to support its poor, have adopted the same rule and have relied upon the cases falling in the class above mentioned as authority.

\* \* \* \* \*

"In this state the duty of caring for the poor is placed upon the counties. Section 19-5-55, R. S. Utah 1933, makes it the duty of the county to provide for the indigent sick and dependent poor within the county, although residing in incorporated cities and towns. There is nothing in our statutes which places upon a city the duty to provide for the poor residing within its limits."

Counsel's assertion overlooks the fact that in this case the employer, if any, was the State Fair Association, and this corporate body is not and was not charged with public welfare. Admittedly it is one arm of the state, yet it is a separate entity in the sense that it can contract or be contracted with, sue, or be sued, and has authority separate and apart from the other state agencies to employ and discharge employees. It can bind itself contractually, within its powers without regard to other departments and it can and does employ certain personnel to carry out its statutory duties. Section 85-4-1, U. C. A. 1943, sets forth the powers of the State Fair Association as follows:

"The Utah state fair association is continued a body corporate with perpetual succession subject to the direction, supervision and control

of the commissioners of the department of publicity and industrial development. It may have and use a corporate seal, and by the aforesaid name may sue and be sued, contract and be contracted with, and take and hold by purchase, gift, devise or bequest, real and personal property required for its uses. It may also, with the approval of the department of finance, convert such property, when not suitable for its uses, into other property which may be suitable for its uses, into other property, or into money provided, however, that money received from such conversion shall be paid into the state treasury and placed to the credit of the state fair association maintenance fund. The Utah state fair association shall be deemed a public corporation, and its property shall be exempt from all taxes and assessments."

It would thus appear that the association here sought to be charged as an employer was a public corporation and was not under any statutory duty or obligation to give support to welfare applicants. The State Fair Association could either employ them as workers or reject them as such. It could either accept the benefits of their endeavors or refuse their services. It was just as much a separate entity for accomplishing its purposes as was the employer in the Ogden City case. The arrangement between the Fair Association and the Welfare Department was wholly voluntary insofar as the Association was concerned. The two state agencies involved treated the Fair Association as an employer, as there was a requirement that the Fair Association furnish compensation to workers sent to it by the Welfare Commission and the Association had the right to discharge any welfare worker referred to it. Such being the case, we are of the opinion the State Fair Association was an employer.

Section 42-1-41, U. C. A. 1943, as amended by Chapter 65, Laws of Utah, 1945, defines an employee as follows:

"(1) Every elective and appointive officer, and every other person, in the service of the state, or of any county, city, town or school district within the state, serving the state, county, city, town or school district therein under any election or appointment, or under any contract of hire, express or implied, written or oral, including all officers and employees of the state institutions of learning."

In addition to this section, this court in a number of recent cases has set out certain factors to test whether or not a person who performs work for another is an employee. While one factor may be entitled to more weight than others, the five suggested by this court are the following, set forth at page 95 of 93 Utah, at page 181 of 71 P. 2d, in the case of *Weber County-Ogden City Relief Committee* v. *Industrial Comm.*:

> "In Labatt's Master and Servant (2d Ed.) 56-74, the author discusses the elements generally held as indicative of the relation of master and servant. He refers to (1) exercise of control over the details of the work, (2) payment of compensation, (3) power of appointment, (4) power of dismissal, and (5) for whose benefit the given work was done. He regards the first element as the one which in the last analysis, must 'always determine what was the essential nature of the relationship between the person who performed the given work and the person for whom it was performed.' The other elements are merely corroborative of the first if the first is shown to be present; and if the first element cannot be shown directly, the other elements are indicative of conditions which imply that control over the worker was in fact exercised by the person declared to be the master."

If we apply these factors to the facts of this case it will be observed that all are present except the payment of compensation. The State Fair Association had the right to control and supervise the activities of the applicant. He was given instructions by the superintendent of the Association, and while the maximum number of hours per week applicant could work was not set by the Fair Association, it is reasonable to assume from the evidence that the Superintendent could and did direct where applicant would work, how the work was to be done, and the days and hours when applicant would work. The Fair Association screened the applicants and was not required to accept those not desired by it. The right to hire and the right to fire was vested in the Association. Both the power of appointment and the power of dismissal were reserved to the Association. As previously indicated, with the exception of being carried on the payroll of the State Fair Association and being limited in the amount he could earn, applicant was subject

to the same control, supervision, direction and orders as any employee in a civilian pursuit. This court has previously held, that a person may be an employee even though the payment of compensation is not made by the employer. The following quotation from *Weber County-Ogden City Relief Committee* case, supra, is applicable in this instance. Speaking for this court, Mr. Justice Elias Hansen stated the following principle at page 97 of 93 Utah, at page 182 of 71 P. 2d:

"It appears, therefore, that, measured by the test approved in *Murray* v. *Wasatch Grading Co.*, supra [73 Utah 430, 274 P. 940], defendant North at the time of his injury was an employee of Ogden City within the meaning of that term as used in the Workmen's Compensation Act. It also appears that all of the elements usually held to be indicative of the relation of employer and employee, referred to in the Murray Case and by Labatt, as above outlined, are present, except that Ogden City did not pay the compensation received by North. The fact that North was not paid by the city for his services is not controlling and is such a circumstance as may be disregarded since all the other evidence points to the conclusion that he was an employee of the city. 1 Labatt's Master and Servant (2d Ed.) 63. It is clear that neither the local unemployment relief committee nor the State Relief Committee, through which Mr. North received compensation for his services, employed him. The funds used to pay him came from federal and state funds raised for the purpose of paying workers who performed work on the 'make work' projects. The mere payment of North's compensation through such a set-up would not tend to prove him to be an employee of the state or local relief committee and would not have the effect of negativing his being an employee of the city."

The Supreme Court of the State of Nebraska in a similar case, *Hendershot* v. *City of Lincoln,* 136 Neb. 606, 286 N. W. 909, 913, reaches the same result and in support of its holding quotes the following language from the case of *Forest Preserve District* v. *Industrial Comm.,* 357 Ill. 389, 192 N. E. 342, 344:

"In the case of *Forest Preserve District* v. *Industrial Commission,* 357 Ill. 389, 192 N. E. 342, 344, one sent by relief organization to work for forest preserve districts held entitled to compensation for injuries from the district, even though the district could not fix wages, yet had complete control of his services. In this case the man re-

ceived a card from the Illinois emergency relief commission, and was sent to the district to work six days a month at $5 a day. He cut his hand on a bottle while loading trash onto a truck; blood-poisoning followed: adhesions, scar tissue, and ankylosis impaired the use of that right hand. The court said:

"'The case presents a situation similar to that where an employee is injured while working for a second employer to whom he has been loaned temporarily. Under the common law an employee in the general employment of one master may with his consent be loaned to another and become the employee of the master to whom he is loaned. *Allan-Garcia Co.* v. *Industrial Commission*, 334 Ill. 390, 166 N. E. 78. The existence of the Workmen's Compensation Act does not change this rule and the test remains the same—that is whether or not the employee becomes wholly subject to the control and direction of the second employer, and freed, during the temporary period, from the control of the original master. Under this rule it is immaterial that the plaintiff in error did not fix the wages and did not select Putkonen as an employee. The record shows it had complete control of his services and that it refused to permit him to go to work on August 5, 1932. The power to refuse to accept him implies the power to dismiss him, if for any reason the plaintiff in error had seen fit to do so. The relation of employer and employee is established by such a showing as is here presented. See *McLaughlin* v. *Antrim County Road Commission*, 266 Mich. 73, 253 N. W. 221.'"

The record in this case convinces us that the applicant occupied the status of an employee, so we pass to consider the next question of importance. This is, does the record establish that the essential characteristics of a contract of hire are present?

The evidence establishes that the State Welfare Commission did not put applicant to work. It entered into a voluntary arrangement with the State Fair Association to permit the Board to have the benefit of applicant's services. The State Fair Association assumed the ■ responsibility of supervising, controlling and directing the activities of the applicant. From the time he reported to the Fair Grounds he was under the exclusive direction of the Superintendent of the Association, who was a regular employee of that organization. The work to be done by applicant was determined by the Association and the method of doing it was determined by its superintendent.

The Association was not required to do the particular job that brought about the injury to applicant, and applicant's only reason for being present at the time and place was because of instructions from the Superintendent. It could commence, continue or discontinue the improvements of the Fair Grounds. It had the right to accept the workers that were satisfactory to its Superintendent and it had the right to fire applicant if he proved unsatisfactory. By agreement with the Welfare Commission it agreed to provide applicant with tools and equipment, necessary material, workmen's compensation, and suitable employment. It received the benefits from the efforts of applicant, and if the work had not been done under the plan adopted, the properties of the Association would not have been improved unless regular employees had been used. The work being done was of such a nature that it was part of the maintenance or improvement work which was necessary to properly maintain the Fair Grounds. If applicant failed to work his allotted hours, his pay was less. The amount he could earn within his budgetary requirements was in direct proportion to the number of hours he worked, and the benefit the Fair Board realized bore a reasonable relationship to the amount of pay applicant received. The association kept a record of this time and certified to the Welfare Department the number of hours he worked. Applicant was required to work with and accept the same risks as regular employees of the Fair Association, and it is a fair inference from the record that the officers of the Fair Association and the Directors of the Welfare Department considered applicant as working under a contract of hire.

In our opinion the facts of this case show a contract of hire. We need not, and neither do we decide, the rights or obligations existing between the Fair Association and the applicant, except to the extent of applicant's right to compensation. Neither do we decide what might be the relationship had the legislature merely set by a plan whereby relief recipients were required to perform some service to qualify for welfare payments. We limit our decision to the

facts of this case which show that the two state agencies, the State Fair Association and the Public Welfare Department agreed on a plan the legal effect of which was to create an employer-employee relationship between the applicant and the State Fair Association, with rights of the latter to hire, fire, control, supervise and regulate the pay of the former.

In this case there is one additional factor which indicates an intent to establish an employer-employee relationship. The Welfare Commission as part of its regulations required the project sponsor to furnish compensation insurance to workers reporting to the sponsor. In using workers with knowledge of this requirement, the project sponsor accepted this condition. Such a provision would be useless verbiage if it were not intended to change the status of a relief recipient to that of an employee subject to the Compensation Act. Such a provision charges the State Fair Association with knowledge that if it accepts relief workers under the plan as worked out it accepts them in the capacity of workers subject to rights of compensation.

In considering this particular provision of the Welfare Department regulations we follow the principles announced by the Supreme Court of Minnesota in the case of *Michels* v. *City of St. Paul*, 193 Minn. 215, 258 N. W. 162, 163. Justice Loring, speaking for the court in that case said:

"It is contended by the city that the provisions of the Workmen's Compensation Act do not apply to relief workers, and that Michels may not have the benefit of the act, and they cite to us the case of *Hanson* v. *St. James Hotel*, 191 Minn. 315, 254 N. W. 4, and a great number of cases from other jurisdictions where it was held that such workers do not come within the benefit of the Compensation Act. There is, however, present in this case an element that was absent in the *Hanson Case* and which we do not find considered in other cases cited to us. In its application for federal funds for the particular project upon which Michels was employed, the city agreed; 'To provide necessary workmen's compensation insurance to cover all persons employed on said project, or if such compensation insurance cannot be obtained, to assume the statutory responsibility for compensation benefits to any injured employees. It is expressly understood that the responsible governing body submitting this application admits

and assumes such responsibility for workmen's compensation as may exist under the laws of the State of Minnesota.' In our opinion this is an outright agreement on the part of the city, made for the benefit of the employee who might be engaged upon the work to which the funds were to be applied, to assume the same responsibility toward him as it would have if it employed the men directly under ordinary normal circumstances and as a matter of contract made for his benefit. We think that the employee may take advantage of this agreement and in consequence is entitled to the relief provided under the Compensation Act. We do not consider the contract ultra vires in the sense that it would be unenforceable against the city."

The Industrial Commission in its decision awarded applicant compensation at the rate of $20.77 per week during the period of temporary total disability. This is in excess of the amount applicant was permitted to draw in the form of welfare payments. Defendants question the method used by the commission in arriving at this weekly figure, and attack the award as being contrary to law.

Section 42-1-70, U. C. A. 1943, presents the method of determining the weekly compensation. This section, insofar as material to this decision, provides:

"The average weekly wage of the injured person at the time of his injury shall be taken as the basis upon which to compute benefits. * * * The average weekly wage shall be determined as follows: * * *

"(3) Determine daily wage as follows: * * *

(f) If the wage is on part-time basis, and the employment is regular, extend the wage to full-time basis, or use the wage the injured would earn if working full time in such employment, and determine as above, in (a).

* * * * *

(5) To determine weekly compensation, let D represent daily wage: If 5½ or 6 days of employment per week—
Dx300x.60 Equals the weekly compensation."

Prior to reporting to the State Fair Association the applicant had been receiving $40 per month from the Welfare Department. This department in adopting the rules and regulations to govern the rate of pay of workers, sent to

projects to work, fixed the amount at 75¢ per hour for unskilled labor, and a different rate for skilled labor. The rate of pay for unskilled labor was the basis used in determining the number of hours to be worked by the applicant. His rate when he reported to the Association was raised to $14.25 per week, and so he was directed to work 19 hours per week. If applicant worked less than the 19 hours he was paid on the hourly rate, and was paid less than the $14.25 per week, this amount being the maximum that applicant could draw through welfare services.

From the evidence it is apparent that both the hourly rate and the maximum weekly rate was considered by the Welfare Board when it set up the employment arrangement. However, it appears that the plan was ■ intended to be a part time arrangement and that for employment purposes the hourly rate of pay was the important factor as applicant was limited to 19 hours per week. This being so the formula adopted by the Commission was the correct one.

In the *Weber County-Ogden City* case this court approved a weekly award which was in excess of the amount the employee could draw through relief sources. In that case this court was not asked to review the amount of the award. We have, however, interpreted the statute in the case of *Morrison-Merrill* v. *Industrial Commission*, 81 Utah 363, 18 P. 2d 295. In that action the employee was paid $4 per day. During a 26 and 4/7 weeks period immediately before the accident because of only working part time, the employee averaged $6.64 per week. The commission took his daily rate of $4 per day as controlling, and by using the formula arrived at an award of $13.85 per week. Mr. Justice Elias Hansen, speaking for the court said, at page 370 of 81 Utah, at page 298 of 18 P. 2d:

"It is earnestly urged on behalf of the plaintiff that if the award in this case is sustained Mr. Walton will receive more in compensation during his disability than he would have received in wages if he had not been injured and that such results are contrary to the aims and purposes of the Industrial Act. Plaintiff's contention in such

respect is not without merit. An examination of the various workmen's compensation acts shows that in many jurisdictions the method of computing compensation to be paid an injured employee, or in case of death to his dependents, is similar to that which prevailed in this jurisdiction before the amendment of 1921, * * * and hence in the amendment of that year it prescribed a rule for computing compensation. That it was competent for the Legislature to prescribe a rule for computing compensation to be paid injured employees is not open to question. or may it be said that the method of computing compensation adopted by the law-making power in the amendment of 1921 is without reason to support it. The loss which an injured employee sustains because of an injury which incapacitates him from work is measured by what he would have earned during the period of his disability rather than by what he actually earned during a given period prior to his injury. The amount earned by an employee who worked intermittently prior to his injury may or may not be a fair index of what he would have earned in the future during a period of disability which may continue for six years, or, in the event the injury results in permanent total disability, for life. It may be that the Legislature intended that the injured employee who, prior to the time of his injury, was unable to secure continuous employment, should be compensated on a basis of loss of earning power rather than on the basis of what he had earned during a given period before he was injured. Those and similar questions are proper subject matters of inquiry by the lawmaking power for its guidance, but the duty of the commission and of this court is confined to ascertaining the intention of the Legislature as expressed in its enactments and to give such intention effect."

The Michigan Supreme Court in the *Michels* v. *City of St. Paul* case, supra, was confronted with a similar situation and yet, because of the part time provisions of the Michigan Statutes, approved an award that was in excess of the amount the employee would have received had he continued to work. In that case, 258 N. W. 162, 163, it is said:

"At the time Michels was injured he was working as a plaster tender on repair or construction work for the board of education. He had been out of employment and had been receiving relief from the board of public welfare of the city, and he was placed upon this work because he had been out of employment and was limited to the number of hours which would bring his pay to a trifle over $40 per month. Had he remained on subsistence relief without working he would have received subsistence amounting to three-quarters of this sum. If he is

entitled to compensation under the act he will, because of its part-time provisions, be entitled to approximately double the amount of compensation that he would be permitted to earn as wages working for the city."

While in the present action the applicant will be entitled to receive more money during the period of temporary total disability than he could receive while dependent on the relief program, this result quite often follows in the case of part time employees. If such a result is or can be considered undesirable, the modifications of the controlling provisions of the statutes must be made by the legislature. Many states have enacted legislation dealing with compensation for relief workers and have prescribed limitations on their rights to recover. The legislature of this state has not seen fit to restrict the principles governing the employer-employee relationship insofar as they apply to relief workers, and we accordingly follow our previous decision touching on this subject.

The award of the Commission is affirmed.

McDONOUGH, C. J., and PRATT, WADE and WOLFE, JJ., concur.